## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RASHEEM CURRY and DAVID TOBER,<br><br>Plaintiff,<br><br>v.<br><br>BAY RIDGE AUTOMOTIVE MANAGEMENT CORP., BAY RIDGE AUTOMOBILES LTD., BAY RIDGE MOTOR SALES, INC., ROUTE 22 NISSAN, INC., and MICHAEL DELACRUZ,<br><br>Defendants. | Civil Action No.: 2:20-cv-12090-KSH-CLW<br><br>**SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Rasheem Curry ("Curry") and David Tober ("Tober") (collectively, "Plaintiffs"), by and through their undersigned counsel, Faruqi & Faruqi, LLP, hereby allege as follows against Defendants Bay Ridge Automotive Management Corp., Bay Ridge Automobiles Ltd., Bay Ridge Motor Sales, Inc. (together, "BRAM Auto"), Route 22 Nissan, Inc. ("Route 22 Nissan" or the "Dealership"), and Michael DeLaCruz ("DeLaCruz") (collectively, "Defendants"):

### NATURE OF THE CLAIMS

1.      The novel Coronavirus, which causes the COVID-19 disease, has infected more than 12.3 million Americans and has caused more than 257,000 deaths nationwide, including more than 308,000 cases and more than 16,000 deaths in New Jersey alone.[1]

2.      In response to this public health crisis, Governor Philip D. Murphy ordered on March 21, 2020 that all non-essential retail businesses close their brick-and-mortar stores and that car dealerships perform only maintenance and repairs.

---

[1] *See* https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html#states (last visited November 23, 2020).

3.      This restriction was later relaxed to allow for remote sales and curbside test drives; however, car dealerships were not permitted to sell cars in-person until 6:00 a.m. on May 20, 2020, at which point they were permitted to conduct in-person sales by appointment.

4.      Within just weeks of the legal moratorium on in-person sales and well before May 20, 2020, Defendants disregarded Governor Murphy's order entirely, putting the health and safety of their employees, customers, and the general public at risk by continuing to perform in-person sales on Route 22 Nissan's showroom floors.

5.      This forced Plaintiffs to choose between protecting their families' health and protecting their livelihoods during a time of economic uncertainty.

6.      Between May 1, 2020 and May 15, 2020, Plaintiffs each engaged in protected activity by complaining to their supervisors about Defendants' failure to comply with the Orders.

7.      Notwithstanding the fact that it was at the time unlawful to open the Dealership to customers, during this same period, Curry requested leave to care for his two children whose school was closed for reasons related to COVID-19.

8.      Tober, on the other hand, requested medical leave, as his asthma placed him at an increased risk for severe COVID-19 symptoms should he contract the disease.

9.      Just a few weeks later, Defendants summarily terminated Plaintiffs' employment under circumstances that unmistakably evince discriminatory and retaliatory animus.

10.      To redress these wrongs, Plaintiffs bring claims against Defendants for violations of the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101, *et seq.* (the "ADA"), the Family and Medical Leave Act, 29 U.S.C. §§ 2601, *et seq.* ("FMLA"), and the Fair Labor Standard Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), as amended by the Families First Coronavirus Response Act, PL 116-127, 134 Stat. 178, *et seq.* ("FFCRA"), the New Jersey Law Against Discrimination,

2

N.J. Stat. Ann. §§ 10:5-12, *et seq.* ("LAD"), the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. §§ 34:19-1, *et seq.* ("CEPA"), and applicable regulations thereunder.

## JURISDICTION AND VENUE

11.     Pursuant to 28 U.S.C. §§ 1331, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiffs' rights under the ADA, FMLA, FLSA, and FFCRA.

12.     Pursuant to 28 U.S.C § 1367, this Court has supplemental jurisdiction over Plaintiffs' related claims arising under State law.

13.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITES

14.     On October 7, 2020, Tober filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, *inter alia*, discrimination in violation of the ADA.

15.     On October 13, 2020, Tober received a Notice of Right to Sue from the EEOC.

16.     Fewer than 90 days have passed since Tober received his Notice of Right to Sue.

17.     Any and all other prerequisites to the filing of this action have been met.

## PARTIES

A.     **Plaintiff Rasheem Curry**

18.     Curry is a resident of the State of New Jersey and was employed by Defendants from on or around October 24, 2012 through on or around June 1, 2020.

19.     At all relevant times, Curry was an "employee" within the meaning of all relevant statutes and regulations.

**B.**     **Plaintiff David Tober**

20.     Tober is a resident of the State of New Jersey and was employed by Defendants from in or around June 2006 through in or around early March 2015, and again from in or around mid-March 2015 through on or around June 8, 2020.

21.     At all relevant times, Tober was an "employee" within the meaning of all relevant statutes and regulations.

**C.**     **Defendant Bay Ridge Automotive Management Corp.**

22.     Bay Ridge Automotive Management Corp. is a foreign corporation with its principal place of business located at 7500 West Side Avenue, North Bergen, New Jersey 07047.

23.     Bay Ridge Automotive Management Corp. employs at least 50, but fewer than 500, employees within a 75-mile radius.

24.     At all relevant times, Bay Ridge Automotive Management Corp. was an "employer" within the meaning of all relevant statutes and regulations.

**D.**     **Defendant Bay Ridge Automobiles Ltd.**

25.     Bay Ridge Automobiles Ltd. is a foreign corporation with its principal place of business located at 7500 West Side Avenue, North Bergen, New Jersey 07047.

26.     Bay Ridge Automobiles Ltd. employs at least 50, but fewer than 500, employees within a 75-mile radius.

27.     At all relevant times, Bay Ridge Automobiles Ltd. was an "employer" within the meaning of all relevant statutes and regulations.

**E.**     **Defendant Bay Ridge Motor Sales, Inc.**

28.     Bay Ridge Motor Sales, Inc. is a foreign corporation with its principal place of business located at 7500 West Side Avenue, North Bergen, New Jersey 07047.

29.     Bay Ridge Motor Sales, Inc. employs at least 50, but fewer than 500, employees within a 75-mile radius.

30.     At all relevant times, Bay Ridge Motor Sales, Inc. was an "employer" within the meaning of all relevant statutes and regulations.

**F.**     **Defendant Route 22 Nissan, Inc.**

31.     Route 22 Nissan is a domestic corporation with its principal place of business located at 56 U.S. 22, Hillside, New Jersey 07205.

32.     Route 22 Nissan employs at least 50, but fewer than 500, employees within a 75-mile radius.

33.     At all relevant times, Route 22 Nissan was an "employer" within the meaning of all relevant statutes and regulations.

**G.**     **Defendant Michael DeLaCruz**

34.     DeLaCruz is employed by BRAM Auto and Route 22 Nissan as the Dealership's General Manager.

35.     At all relevant times, DeLaCruz established, implemented, disseminated, and controlled Defendants' employment policies.

36.     At all relevant times, DeLaCruz controlled and directed the terms and conditions of Plaintiffs' employment.

37.     At all relevant times, DeLaCruz maintained and exercised power to hire, fire, discipline, and promote Plaintiffs.

38.     At all relevant times, DeLaCruz was an "employer" within the meaning of all relevant statutes and regulations.

## FACTS

A.     **New Jersey State Government Orders Concerning COVID-19**

39.     On February 3, 2020, Governor Philip D. Murphy issued Executive Order No. 102, which creates a Coronavirus Task Force to coordinate New Jersey's efforts to appropriately respond to the public health hazard posed by the novel Coronavirus, which causes the COVID-19 disease. *See* Exhibit A.

40.     On March 9, 2020, Governor Murphy issued Executive Order No. 103, which declares a Public Health Emergency and State of Emergency in response to the COVID-19 pandemic. *See* Exhibit B.

41.     Executive Order No. 103 also details the various bases of Governor Murphy's declarations, including, without limitation: (i) the risk of fatal respiratory disease posed by COVID-19; (ii) the contagious nature of the virus; (iii) global and federal declarations of a public health emergency; (iv) a high number of confirmed COVID-19 cases and deaths nationwide; and (v) the existence of confirmed and suspected COVID-19 cases in New Jersey and its neighboring states.

42.     On March 21, 2020, Governor Murphy issued Executive Order No. 107, which mandates that "[t]he brick-and-mortar premises of all non-essential retail businesses must close to the public as long as this Order remains in effect." *See* Exhibit C at 6.

43.     Executive Order No. 107 creates exceptions to this mandate for certain "[e]ssential retail businesses." *Id.*

44.     Executive Order No. 107 lists car dealerships as essential retail businesses that were exempt from the mandated closure, "but only to provide auto maintenance and repair services, and auto mechanics[.]"  *Id.* at 7.

45.     On March 30, 2020, the Office of Emergency Management ("OEM") issued Administrative Order No. 2020-6 (*see* Exhibit D), which clarifies certain portions of Executive Order No. 107.

46.     Administrative Order No. 2020-6 states, in relevant part: "Car dealers may continue to conduct online sales or remote sales that can be completed by phone, text, or email, and are consistent with current law.  Such sales shall be deemed permissible in accordance with paragraph 6 of Executive Order No. 107.  In the event of such a sale, the car may be delivered to the purchaser or the purchaser can pick up the car curbside or in the dealership service lane.  Picking up a car from a dealership shall be considered essential retail business for the purposes of paragraph 6 of Executive Order No. 107."  *Id.* at 1-2.

47.     On April 27, 2020, OEM issued Administrative Order No. 2020-10.  *See* Exhibit E.

48.     Administrative Order No. 2020-10 states, in relevant part: "Car dealerships may permit customers that have ordered and/or purchased a vehicle online or by phone to test drive the vehicle at the time of pick-up or prior to delivery, provided that the dealership adopts in-person operation policies that 1) include, at a minimum, the enhanced social distancing practices detailed in paragraph 1 of Executive Order No. 122 (2020), 2) permit the individual to access the vehicle alone, and 3) provide that the dealership is to appropriately clean and sanitize the vehicle after such test drive if the customer does not purchase the vehicle."  *Id.* at 2.

49.     The enhanced social distancing practices detailed in Paragraph 1 of Executive Order No. 122 include, without limitation: (i) installing physical barriers between customers and

employees; (ii) ensuring six feet of social distance between customers and employees other than at the moment of payment or exchange of goods; and (iii) requiring employees and customers to wear cloth face coverings.  *See* Exhibit F at 5-7.

50.     On May 19, 2020, OEM issued Administrative Order No. 2020-13, which permits car dealerships to resume in-person sales so long as they operate under various conditions, including, without limitation, ensuring that all customer visits, including sales, are made by appointment only.  *See* Exhibit G (together with Exhibits A-F, the "Orders") at 2-3.

51.     Plaintiffs hereby incorporate by reference each of the Orders in their entirety, including the factual findings, guidelines, and legal restrictions and requirements reflected therein.

52.     Executive Order No. 107 states that it will "remain in effect until revoked or modified by the Governor[.]"  Exhibit C at 13.

53.     Administrative Order No. 2020-13 states that it will "remain in effect for as long as Executive Order No. 107 (2020) remains in effect" or until OEM issues a subsequent order amending it.  Exhibit G at 4.

**B.     Defendants' Short-Lived Compliance with the Orders**

54.     On or around March 22, 2020, Defendants announced the closure of Route 22 Nissan in compliance with Executive Order No. 107.

55.     The closure ultimately lasted just over one month.

56.     On April 27, 2020, DeLaCruz sent a text message to Plaintiffs and a group of 14 other employees of Defendants.  *See* Exhibit H at 1.

57.     DeLaCruz directed each of the employees to inform him by April 28, 2020 whether they planned to return to work for Defendants.  *Id.*

58.     In reply to DeLaCruz's message, General Sales Manager James Cavallaro ("Cavallaro") added that Route 22 Nissan was opening on May 1, 2020.  *Id.* at 2.

59.     Cavallaro also wrote: "If you [decide] not come back to work you get paid 75% of what you would get weekly, for the next 6 weeks.  Unless you have a doctors [*sic*] note stating you cannot come to work."  *Id.*

60.     Despite the fact that it was unlawful to conduct in-person sales at the time, Cavallaro later clarified, "[I]f you decide not to come back for any reason other than a doctors [*sic*] note for being sick, it will be considered a resignation."  *Id.* at 3.

**C.     Defendants' Unlawful Reopening of the Dealership**

61.     The day before Route 22 Nissan reopened completely, Defendants asked Curry and several other employees to report to work for a meeting.

62.     Per Defendants' request, Curry attended the April 30, 2020 meeting, which was held in the Dealership's service department and led by DeLaCruz.

63.     At the meeting, DeLaCruz informed those in attendance that Defendants intended to conduct in-person sales to customers out of the Dealership's service department.

64.     Defendants planned to seat customers in the service department and have salespeople shuttle back and forth between the service department and the salesfloor.

65.     DeLaCruz also noted that the doors to the salesfloor would remain locked at all times.

66.     During the meeting, Curry expressed concern that, if he returned to work, his two sons would be without childcare as their school was closed due to COVID-19.

67.     DeLaCruz directed Curry to speak to Defendants' Human Resources ("HR") department about his childcare needs.

68.     Curry worked the remainder of the day at the Dealership.

69.     Plaintiffs and the rest of the Dealership's employees reported to work on May 1, 2020.

70.     At the beginning of the day, DeLaCruz led a meeting similar to the one held in the service department the day before.

71.     DeLaCruz again explained that salespeople were to conduct sales out of the service department and that the doors to the salesfloor would remain locked at all times.

72.     Further, DeLaCruz told the employees that they could refuse to report to work only if they provided Defendants with a doctor's note; however, employees who refused to report to work risked losing their jobs.

73.     Within about 30 minutes of this meeting, Defendants had already reopened the salesfloor and allowed customers to roam freely throughout, without regard for social distancing guidelines.

74.     Indeed, rather than limiting operations to remote sales, curbside pickup, and repairs, Defendants staffed the showroom floor with sales representatives and conducted sales in-person, just as they did prior to the Orders.

75.     Moreover, less than half of the people on the salesfloor were wearing masks.

76.     This violated the Orders.

**D.      Curry's Protected Activities and Retaliatory Termination**

77.     On or around May 4, 2020, Curry complained to his supervisor, Sales Manager Ed Cortes ("Cortes"), that Defendants were not complying with the Orders.

78.     Specifically, Curry told Cortes that Defendants were not allowed to sell cars directly to customers in-person or permit customers to walk around the salesfloor.

79.     Curry also complained that Defendants were not requiring people to wear masks or otherwise implementing various safety measures that DeLaCruz had promised via text message on April 27, 2020.  *See* Exhibit H at 3-5.

80.     After speaking with Cortes, Curry met with HR Manager Donna Zuidema ("Zuidema").

81.     Per DeLaCruz's instruction during the April 30, 2020 meeting, Curry told Zuidema that, due to COVID-19, he did not have childcare coverage during the workday and requested leave.

82.     Zuidema told Curry that he was entitled to take leave from work under the FFCRA.

83.     Zuidema promised to send Curry paperwork in connection with his request for leave.

84.     On May 5, 2020, Curry notified DeLaCruz that he could not report to work that morning or for the remainder of the week, as he needed to stay home to provide childcare.

85.     In response, DeLaCruz directed Curry to contact Zuidema.

86.     Curry then called Zuidema, who again assured him that he was permitted to take leave for childcare and promised to send him paperwork in connection with the same.

87.     Two days later, DeLaCruz asked that Curry return his keys to the Dealership.

88.     On May 15, 2020, Curry followed up with Zuidema via email, as she had not yet sent him the paperwork.

89.     Zuidema responded that she believed Curry was out of work because he was "not comfortable."

90.     Curry then called Zuidema to remind her of their conversation about his childcare needs, which he had also raised with DeLaCruz.

91.     Shortly thereafter, Defendants sent Curry an "FFCRA Leave Request Form," which Curry completed and returned to Defendants less than two hours later.

92.     Curry worked at least 1,250 hours during the 12 months prior to his request for four weeks of FFCRA-qualifying leave.

93.     On May 28, 2020, Curry emailed Zuidema that he was ready to return to work, as he had obtained childcare coverage for his two sons.

94.     Zuidema confirmed that she had Curry "listed out for child care" and asked him to contact DeLaCruz regarding his return.

95.     Curry returned to work on or around June 1, 2020.

96.     Shortly after Curry arrived at the Dealership, DeLaCruz informed him that Defendants had decided to terminate his employment, effective immediately, citing purported financial struggles.

97.     Curry asked whether he was being fired for taking leave and alluded to DeLaCruz's April 30, 2020 and May 1, 2020 warnings that employees who did not report to work risked losing their jobs.

98.     Curry also mentioned that Zuidema had assured him that his job would be protected throughout his FFCRA leave.

99.     DeLaCruz denied any recollection of his prior warnings and did not address whether Defendants were terminating Curry for taking leave.

100.     As is clear from the circumstances, Defendants fired Curry in retaliation for his complaints about violations of the Orders and request for FFCRA-qualifying leave.

**E.     Tober's Protected Activities and Unlawful Termination**

101.    Tober returned to work on May 1, 2020.

102.    Shortly after he arrived at the Dealership, it became readily apparent to Tober that Defendants were completely disregarding the Orders.

103.    At the conclusion of his shift, Tober provided a doctor's note to Cortes, his supervisor.

104.    The note stated that Tober suffers from asthma and recommended that he remain out of work until June 11, 2020.

105.    Tober has suffered from asthma for most of his life.

106.    He takes medication for his asthma daily and consults with his doctor regularly regarding the same.

107.    Tober then called Cavallaro to inform him that he provided a doctor's note to Cortes and requested leave until June 11, 2020 due to his asthma and the risk that he might be exposed to COVID-19 by working at the Dealership.

108.    Cavallaro said he would relay Tober's request for medical leave to DeLaCruz.

109.    On or around May 3, 2020, Tober called DeLaCruz regarding his request for medical leave.

110.    During the call, Tober complained to DeLaCruz that Defendants had reopened the Dealership for in-person sales, with all salespeople on staff, in violation of the Orders.

111.    Tober complained further that Defendants did not require people to wear masks while inside the Dealership and did not enforce social distancing guidelines, which also violated the Orders.

112.     DeLaCruz was dismissive of Tober's concerns, but ultimately approved his request for FMLA-qualifying leave.

113.     Tober worked at least 1,250 hours during the 12 months prior to his request for FMLA-qualifying leave.

114.     On May 25, 2020, per DeLaCruz's request, Tober visited the Dealership to drop off an iPad that Defendants had issued to him.

115.     Given that the Dealership was legally permitted to conduct in-person sales as of May 20, 2020, Tober inquired to DeLaCruz about returning to work.

116.     DeLaCruz said he could not commit to bringing Tober back to work.

117.     On June 3, 2020, Tober spoke with DeLaCruz again about returning to work for Defendants.

118.     DeLaCruz said he still could not commit to bringing Tober back, and could not do so until June 15, 2020 at the earliest due to Defendants' receipt of a federal Payroll Protection Program loan.

119.     On June 8, 2020, Finance Manager Rafael Figureoa called Tober and directed him to return to work immediately.

120.     At approximately 5:00 p.m. on June 8, 2020, DeLaCruz called Tober into his office and terminated his employment, effective immediately, citing a lack of business.

121.     Tober asked DeLaCruz why he was being fired, whereas another salesperson had also refused to work after the May 1, 2020 meeting, without providing a doctor's note, yet was permitted to return on May 25, 2020.

122.     Conversely, Tober's May 25, 2020 request to return to work had been denied.

123. DeLaCruz provided no insight into the decision, apart from saying that the other salesperson had somehow made it in "under the wire" despite asking to return to work on the same exact day as Tober.

124. It was clear to Tober from this exchange and the other circumstances surrounding his termination that, in truth, Defendants had fired him based on his disability, request for FMLA-qualifying leave, and complaints about Defendants' violations of the Orders.

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE FFCRA: RETALIATION
### *(On Behalf of Curry)*

125. Curry hereby repeats and realleges the foregoing allegations as if set forth fully herein.

126. During the full statutory period, Curry was protected by the provisions of the FMLA, 29 U.S.C. §§ 2601, *et seq.*, and FLSA, 29 U.S.C. §§ 201, *et seq.*, as amended by the FFCRA, PL 116-127, 134 Stat. 178, and all applicable regulations thereunder.

127. During the full statutory period, Defendants were subject to the provisions of the FMLA, 29 U.S.C. §§ 2601, *et seq.*, and FLSA, 29 U.S.C. §§ 201, *et seq.*, as amended by the FFCRA, PL 116-127, 134 Stat. 178, and all applicable regulations thereunder.

128. As set forth above, Curry requested FFCRA-qualifying leave to care for his children, whose school was closed for reasons related to COVID-19.

129. By the actions described above, among others, Defendants unlawfully retaliated against Curry for exercising his rights under the FFCRA by, *inter alia*, terminating his employment.

130.    As a direct and proximate result of Defendants' unlawful retaliation in violation of the FFCRA, Curry has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

131.    Curry is further entitled to an award of reasonable attorneys' fees and costs.

### SECOND CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF THE ADA
### (*On Behalf of Tober*)

132.    Tober hereby repeats and reallege the foregoing allegations as if set forth fully herein.

133.    During the full statutory period, Tober was protected by the provisions of the ADA, as amended, 42 U.S.C. §§ 12101, *et seq*., and all applicable regulations thereunder.

134.    As described above, Defendants were aware that Tober suffered from recognized disabilities, including, *inter alia*, asthma.

135.    By the actions described above, among others, Defendants discriminated against Tober based on his recognized disabilities by, *inter alia*, terminating his employment.

136.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Tober has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of damages.

137.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADA, Tober has suffered, and continues to suffer, emotional distress for which he is entitled to an award of compensatory damages.

138.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and/or showed a deliberate, willful, wanton, and reckless indifference to Tober's rights under the ADA, for which Plaintiff is entitled to an award of punitive damages.

139.    Tober is further entitled to an award of reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION
## VIOLATIONS OF THE FMLA: RETALIATION
### *(On Behalf of Tober)*

140.    Tober hereby repeats and realleges the foregoing allegations as if set forth fully herein.

141.    During the full statutory period, Tober was protected by the provisions of the FMLA, 29 U.S.C. §§ 2601, *et seq.*, and all applicable regulations thereunder.

142.    During the full statutory period, Defendants were subject to the provisions of the FMLA, 29 U.S.C. §§ 2601, *et seq.*, and all applicable regulations thereunder.

143.    As set forth above, Tober requested FMLA-qualifying leave, as his asthma placed him at an increased risk for severe COVID-19 symptoms should he contract the disease.

144.    By the actions described above, among others, Defendants unlawfully retaliated against Tober for exercising his rights under the FMLA by, *inter alia*, terminating his employment.

145.    As a direct and proximate result of Defendants' unlawful retaliation in violation of the FMLA, Tober has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

146.    Tober is further entitled to an award of reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF THE LAD: RETALIATION
### *(On Behalf of Tober)*

147.    Tober hereby repeats and realleges the foregoing allegations as if set forth fully herein.

148.    During the full statutory period, Tober was protected by the provisions of the LAD, N.J. Stat. Ann. §§ 10:5-12, *et seq.*, and all applicable regulations thereunder.

149.     During the full statutory period, Defendants were subject to the provisions of the LAD, N.J. Stat. Ann. §§ 10:5-12, *et seq.*, and all applicable regulations thereunder.

150.     As set forth above, Tober suffered from recognized disabilities, including, *inter alia,* asthma.

151.     Defendants were aware of Tober's recognized disabilities and/or perceived him as disabled.

152.     Tober was qualified to perform the essential functions of his job with or without a reasonable accommodation by Defendants.

153.     By the actions described above, among others, Defendants discriminated against Tober based on his recognized disabilities by, *inter alia*, terminating his employment.

154.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the LAD, Tober has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

155.     Tober is further entitled to an award of reasonable attorneys' fees and costs.

## FIFTH CAUSE OF ACTION
## VIOLATIONS OF THE CEPA: RETALIATION
### *(On Behalf of Plaintiffs)*

156.     Plaintiffs hereby repeat and realleges the foregoing allegations as if set forth fully herein.

157.     During the full statutory period, Plaintiffs were protected by the provisions of the CEPA, N.J. Stat. Ann. §§ 34:19-1, *et seq*., and all applicable regulations thereunder.

158.     During the full statutory period, Defendants were subject to the provisions of the CEPA, N.J. Stat. Ann. §§ 34:19-1, *et seq*., and all applicable regulations thereunder.

159.    As set forth above, Defendants engaged in activities, policies, and/or practices that were in violation of law – namely, the Orders – by, *inter alia*, conducting in-person (*i.e.*, non-remote) car sales and requiring that Plaintiffs report to work to do or assist with the same.

160.    Plaintiffs each reasonably believed that Defendants were engaged in activities, policies, and/or practices that violated the Orders.

161.    Plaintiffs each engaged in protected activities by, *inter alia*, complaining about Defendants' unlawful activities, policies, and/or practices to their supervisors.

162.    Curry engaged in protected activity by, *inter alia*, complaining verbally to Cortes on May 4, 2020 regarding Defendants' unlawful conduct.

163.    Tober engaged in protected activity by, *inter alia*, complaining to DeLaCruz on May 3, 2020 over the phone regarding Defendants' unlawful conduct.

164.    Defendants retaliated against Plaintiffs for their protected activities by, *inter alia*, terminating their employment.

165.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the CEPA, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm for which they are entitled to an award of damages to the greatest extent permitted by law.

166.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the CEPA, Plaintiffs have suffered and continue to suffer harm for which they are entitled to an award of damages to the greatest extent permitted by law.

167.    Because Defendants and their upper management directly participated in and/or were willfully indifferent to their unlawful conduct, Plaintiffs are entitled to an award of punitive damages to the greatest extent permitted by law.

168.    Plaintiffs are further entitled to an award of reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Declare that the practices complained of herein are unlawful under applicable federal and State law;

B.     Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     Grant Plaintiffs an award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate them for their economic damages;

D.     Grant Plaintiffs an award of damages in an amount to be determined at trial to compensate them for all non-monetary and/or compensatory damages they have suffered, including, without limitation, compensation for their emotional distress;

E.     Grant Plaintiffs an award of punitive damages in an amount to be determined at trial;

F.     Grant Plaintiffs an award of liquidated damages in amount to be determined at trial;

G.     Grant Plaintiffs an award of reasonable attorneys' fees to the greatest extent permitted by law;

H.     Grant Plaintiffs an award of reasonable costs that they have incurred in this action, including, without limitation, expert witness fees;

I.     Grant Plaintiffs all other available damages to the greatest extent permitted by law; and

J.     Grant such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues of fact and damages.

Dated: March 11, 2021  
New York, New York

**FARUQI & FARUQI, LLP**

By: ___/s/ Alex J. Hartzband_____  
Alex J. Hartzband

685 Third Avenue, 26th Floor  
New York, New York 10017  
Telephone: 212-983-9330  
Facsimile: 212-983-9331  
ahartzband@faruqilaw.com

*Attorneys for Plaintiffs*